KEITH H. RUTMAN (CSB #144175)
501 West Broadway Ste 1650
San Diego, California 92101-3541
Telephone: (619) 237-9072
Facsimile: (760) 454-4372
email: krutman@krutmanlaw.com

Attorney for Plaintiff
CHRISTOPHER VADNAIS

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA
(Hon. William Q. Hayes)

| | |
|---|---|
| CHRISTOPHER VADNAIS,<br><br>Plaintiff,<br><br>v.<br><br>CITY OF OCEANSIDE, OCEANSIDE POLICE OFFICER NIKOLAS NUNEZ, and DOES 1-10,<br><br>Defendants. | Case No. 16-CV-251-WQH (KSC)<br><br>PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT OR SUMMARY ADJUDICATION<br><br>DATE: 4/17/17<br>NO ORAL ARGUMENT UNLESS REQUESTED BY COURT |

COMES NOW Plaintiff, by and through his attorney KEITH H. RUTMAN, and hereby files his Opposition to Defendant's Motion for Summary Judgment or alternatively for Summary Adjudication. Said Opposition is based on the grounds that genuine issues of material fact exist as to all claims for relief and further that qualified immunity is not appropriate.

Said Opposition is based on the instant Opposition, Memorandum of Points and Authorities, the attached Declarations of Keith H. Rutman, Jack Smith, Roman Beck and Joseph Cohen and accompanying Exhibits, the enclosed Statement of Genuine Disputes, the records and files in the instant case, and any and all other matters which may be presented to the Court prior to or at the time of the hearing of said Motion.

Respectfully Submitted,

Dated: April 3, 2017

/s/ Keith H. Rutman
KEITH H. RUTMAN
Attorney for Plaintiff
Email: krutman@krutmanlaw.com

# TABLE OF CONTENTS                                    Page(s)

I.    *Introduction* .................................................. 1

II.   *Statement of Facts* ........................................... 1

III.  *The Applicable Summary Judgment Standards* .................... 10

IV.   *The Appropriate Consideration of Video Evidence* .............. 11

V.    *The Motion for Summary Judgment as to the Claim under*
      *42 U.S.C. § 1983 for Excessive Force Must Be Denied Because Disputed*
      *Issue of Material Fact Remain* ................................ 14

      A.   *This Case must be Analyzed in 2 Discrete Segments.   First, the*
           *Push and the Punch, and Second, the Subsequent Fracas* ........ 16

      B.   *Summary Judgment is not warranted when it comes to the push and*
           *the punch because too many facts are in dispute* .............. 17

VI.   *The Motion for Summary Judgment as to the Claim for Battery under*
      *California Law Must Be Denied Because the Corresponding Civil Rights*
      *Claim is not Subject to Summary Judgment* ..................... 23

VII.  *Whether Officer Nunez Is Entitled to Qualified Immunity Cannot Be*
      *Resolved at the Summary Judgment Stage Because of the Existence of*
      *Genuine Disputes of Material Fact* ............................ 23

VIII. *Conclusion* .................................................. 25

i

## TABLE OF AUTHORITIES                          Page(s)

Cases

Anderson v. Creighton, 483 U.S. 635 (1987) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

Anderson v. Liberty Lobby, Inc., 477 U.S. 242 (1986) . . . . . . . . . . . . . . . . . . . 10

Ashcroft v. al–Kidd, 563 U.S. 731 (2011) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

Beier v. City of Lewiston, 354 F.3d 1058 (9th Cir. 2004) . . . . . . . . . . . . . . . . 16

Billington v. Smith, 292 F.3d. 1177 (9th Cir. 2002) . . . . . . . . . . . . . . . . . . . . . . 16

Brosseau v. Haugen, 543 U.S. 194 (2004)(per curiam) . . . . . . . . . . . . . . . . . 11, 25

Celotex Corp. v. Catrett, 477 U.S. 317 (1986) . . . . . . . . . . . . . . . . . . . . . . . . . 10

County of Los Angeles et. al. v. Mendez, et. al.,
   815 F.3d 1178 (9th Cir. 2016) rehearing denied 6/23/16, cert. granted
   12/2/16, No. 16-369 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

Deorle v. Rutherford, 272 F.3d 1272 (9th Cir. 2001) . . . . . . . . . . . . . . . . . . . . . 15

Deppe v. United Airlines, 217 F.3d 1262 (9th Cir. 2000) . . . . . . . . . . . . . . . . . . 10

Edson v. City of Anaheim, 63 Cal.App.4th 1269 (1998) . . . . . . . . . . . . . . . . . . . 23

Graham v. O'Connor, 490 U.S. 386 (1989) . . . . . . . . . . . . . . . . . . . . . . . . . . 15, 17

Headwaters Forest Defense v. County of Humboldt, 240 F.3d 1185 (9th Cir.
   2000), vacated and remanded on other grounds sub nom. County of
   Humboldt v. Headwaters Forest Defense, 534 U.S. 801 (2001) . . . . . . . . . . . . . . 15

Hope v. Pelzer, 536 U.S. 730 (2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

Hughes v. Kisela 841 F.3d 1081 (9th Cir. 2016) . . . . . . . . . . . . . . . . . . . . . . 24-25

Hunter v. Bryant, 502 U.S. 224 (1991) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

Kodani v. Snyder 75 Cal.App.4th 471 (1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

Leslie v. Grupo ICA, 198 F.3d 1152 (9th Cir. 1999) . . . . . . . . . . . . . . . . . . . . . 10

Liston v. County of Riverside, 120 F.3d 965 (9th Cir. 1997) . . . . . . . . . . . . . . . 24

Malley v. Briggs, 475 U.S. 335 (1986) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

Missouri v. McNeely, 133 S.Ct. 1552 (2013) . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

Monroe v. Pape, 365 U.S. 167 (1961) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

Moreno v. Baca, 431 F.3d 633 (9th Cir. 2005) . . . . . . . . . . . . . . . . . . . . . . . . . . 23

Mullenix v. Luna, 136 S. Ct. 305 (2015) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

Pearson v.  Callahan 555 U.S. 223 (2009) . . . . . . . . . . . . . . . . . . . . . . . . . . 23-24

People v. Wilson, 114 Cal. App.4th 953 (2003) . . . . . . . . . . . . . . . . . . . . . . . . . 19

Santos v. Gates, 287 F.3d 846 (9th Cir.2002) . . . . . . . . . . . . . . . . . . . . . . . . . . 24

Saucier v. Katz, 533 U.S. 194 (2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

Page(s)

Schwenk v. Hartford, 204 F.3d 1187 (9th Cir. 2000) . . . . . . . . . . . . . . . . . . . . . . 23
Scott v. Henrich, 39 F.3d 912 (9th Cir. 1994) . . . . . . . . . . . . . . . . . . . . . . . . . . . 20
Scott v. Harris, 550 U.S. 372 (2007) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11
Tate v. Canonica, 180 Cal. App. 2d. 898 (1960) . . . . . . . . . . . . . . . . . . . . . . . . . 17
Tekle v. U.S. 457 F.3d 1088 (9th Cir. 2006) . . . . . . . . . . . . . . . . . . . . . . . . 15, 24
United States v. Collins, 427 F.3d 688 (9th Cir. 2005) . . . . . . . . . . . . . . . . . . . . 18
United States v. Lanier, 520 U.S. 259 (1997) . . . . . . . . . . . . . . . . . . . . . . . . . . . 25
Wall v. County of Orange, 364 F.3d 1107 (9th Cir. 2004) . . . . . . . . . . . . . . . . . 11
White v. Pauly, 137 S. Ct. 548 (2017) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24
Wood v. Strickland, 420 U.S. 308 (1985) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

Statutes

42 U.S.C. § 1983 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . passim
California Penal Code § 69 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21
California Penal Code § 148 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21
California Vehicle Code §23612 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18-19

Rules

F.R.C.P. 56(c) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

Jury Instructions

Ninth Circuit Instruction 9.25 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

Misc

https://newschicagobooth.uchicago.edu/newsroom/viewing-video-slow-motion-ma
kes-action-appear-more-intentional-new-study-finds . . . . . . . . . . . . . . . . . . . . . 13

http://www.pnas.org/content/113/33/9250.full . . . . . . . . . . . . . . . . . . . . . . . . . . 13

iii

*Memorandum of Points and Authorities*

*I.    Introduction*

According to Defendants, while rushing into a bar to assist his partner, who was engaged in a struggle with an unarmed suspect, Officer Nunez was grabbed on the right arm with sufficient force to spin him around.  As he turned, he says he heard someone say "stay out of it."  He then saw Mr. Vadnais and instantly perceived him as a threat based upon his "fighting stance."  To "distract" Mr. Vadnais so he could aid his partner, Officer Nunez intentionally punched Mr. Vadnais in the eye and pushed him to the ground. Thereafter, Plaintiff tried to charge Officer Nunez, but was restrained by his friends and eventually, Officer Nunez as well.  He was arrested.

Plaintiff tells a different version.  He his wife, her cousin, and her cousin's boyfriend were enjoying a night out.  It ended at a bar he had never been to before.  After the other officer and the suspect knocked him off his chair, a large man in dark clothing rushed by him after pushing his wife.  He instinctively reached out to get that person's attention.  It was at that point that he realized the man was a police officer.  As a video of the events shows, Plaintiff was not in a "fighting stance" but instead, was in motion, pointing back towards his wife behind him.  Officer Nunez punched Mr. Vadnais in the eye and pushed him to the ground as he was attempting to back off.  Officer Nunez later learned Mr. Vadnais was intoxicated.

Officer Nunez claims he acted reasonably under the circumstances.  The nature of the physical contact, what was said by Mr. Vadnais, what was perceived by the officer and whether his conduct was reasonable are all in dispute.  This requires Defendants' motion be denied.  The events were videotaped, but the videotape does not definitively tell the story.  The entirety of the encounter took 1.3 seconds.

*II.    Statement of Facts*

Around 6:30 pm or so on September 26, 2015, Chris Vadnais, his wife Dana, her cousin Jennifer Young, and Jennifer's boyfriend Dean Sainz met for dinner at Hello Betty's, a seafood restaurant by the Oceanside pier.  The Vadnais' arrived by Uber about a

half hour before the others and they had a drink while waiting.[1]  Chris Vadnais Depo @ 174-179, 198, 207-208; Dana Vadnais Depo @ 91-92; Sainz Depo @ 74-6.

After dinner, they went upstairs for an nightcap and left shortly after closing at 10 pm.  Chris Vadnais Depo @ 198, 205, 210; Dana Vadnais Depo @ 102.  The group was having fun, and decided to go somewhere else.   Dean drove them to the Pour House, a bar with a decidedly younger crowd.  The waited in line and when they got in, decided not to stay and left.  Jennifer suggested they go to Tony's Sports Bar & Grill on South Harbor Drive[2].  Sainz Depo @ 44-8; 68. Chris and Dana had never been there before.  They arrived "three songs before midnight," near the end of the live band's set.  Dana was mostly sober and just wanted to go home.  Chris was buzzed.  Dana Vadnais Depo @ 103-104; Sainz Depo @105.  Chris mostly sat and talked to Dean at a table near the stage, while Dana and Jennifer sat across the aisle at the bar.  Chris alternated back and forth.

---

[1]  Exhibit 8, 8a and 8b represent the entire bar and food tab from the restaurant.  While recollections differ slightly, it is generally understood that Dana consumed the vodka, Chris and Dean had the margaritas, and Chris and Jennifer drank the beers.   Chris Vadnais Depo @ 180-187, 190-205; Dana Vadnais Depo @ 78-82; Sainz Depo @43.  The last 3 beers were purchased but noone remembers drinking them.  Perhaps the group was overcharged.  Noone was really keeping track at the time.  Chris Vadnais Depo @ 208; Dana Vadnais Depo @ 82; Sainz Depo @ 78, 87.

[2]  The entirety of the events was captured by a 4-camera video system mounted throughout the bar.  (Exhibits 7 & 7a).  Milam Depo @ 45.  The frame rate was 30 frames per second.  Declaration of Roman Beck and exhibit report attached thereto.  During their depositions, questions alternated between what witnesses saw on the video and what they remembered independently of the video.  Almost every witness deposed saw the video at least once before their deposition.  Throughout the depositions, witnesses were shown still frames and explain to explain that moment in time.  Plaintiff specifically objected at his deposition to basing any conclusions on single images ripped in time from a continuous sequence of events.  Chris Vadnais Depo @ 301, ll 17-21.  Exhibits 19-42 consist of exactly these types of out of context images.

There was some tension between Dean and Jennifer that evening.  Sainz Depo @ 96-7.
Dana had a vodka & soda, Jen and Chris had beer.  Dana Vadnais Depo @ 106.  Dean,
who was driving, did not recall drinking anything at Tony's.  Sainz Depo @43.  Chris
believes he drank two IPAs at Tony's.   Chris Vadnais Depo @ 213-230.  Everyone had a
good time talking and listening to the band and jukebox.  At the end of the night, Jennifer
paid the entire bar tab, which consisted of a $37.00 drink bill and a $100 tip for the
bartender, Janet Milam, whom she knew.  Milam Depo @ 22-24.

The four remember seeing a police presence, but gave it no mind.  Dana Vadnais
Depo @ 110, 123.  The group was minding their own business when an encounter between
Officer Sabino and Nestor Bohnstehn (a complete stranger to the Vadnais group) occurred.
Everyone's attention was drawn to the melee.  The two men wrestled for a short period of
time and while moving backwards, accidentally knocked Mr. Vadnais off his chair,
causing him to lose his balance.  As he testified:

> A · · I just think I remember getting like -- kind of banged into, like, you don't know what's going on and just, like, you know, trying to get my balance 'cause I think I was sitting with my legs crossed.· So, yeah, it was just -- everything happened so fast, you really don't have time to process anything that's happening. . . .
>
> Q · · And then after the officer hit your chair, what did you do?
> A · · I think I stood up.
> Q · · And did your wife come over to you during that period of time?
> A · · Yes.
> Q · · And was she trying to tell you to be calm and --
> A · · I think she was trying to say, "We need to get out of here."
>
> Q · · But you actually -- before your wife came over or around the time your wife was there, you actually grabbed the officer that was in the altercation with the gentleman from the table; isn't that true?
> A · · I don't think I grabbed him.· I think I was just trying to catch my balance and stand up. I don't think I grabbed him, no.· I don't -- I mean, I would never -- it's not something I'd do.· It's not my character.· I would -- no matter what the circumstance was.
> Q · · You did put your hand out and touch him; isn't that true, sir?
> A · · Yes.
> Q · · And -- and that was before Officer Nuñez entered the bar; isn't that correct, sir?
> A · · Yes, it is.
> Q · · And at that point in time, when you were knocked, you were angry about being knocked by the officer and the gentleman that were fighting; isn't that true?
> A · · I think it was more shock of what was happening than -- yeah.· I

3

wouldn't be angry. I mean, they didn't -- there's no reason to be angry. They didn't try to knock me over.· It was just a – you know.

\* \* \*

Q· · Do you see yourself grabbing at the officer?
A· · I see myself falling over and trying to – you know, when you fall, you try to catch yourself, brace yourself, try to regain balance, I guess I would say.
Q· · You actually touch the officer at this point, don't you?
A· · Yes.
Q· · And do you say anything at this point in time?
A· · Oh, I don't -- I don't think so.· I don't know what I would possibly say.· I don't recall saying anything. . . .

Q· · Do you see you're still grabbing the officer at this point in time?
A· · I see I'm trying to stand up now.
Q· · By bracing yourself on the officer, who is fighting with the patron?
A· · Yes.
Q· · Sir, do you understand that by bracing yourself and trying to stand up while you're bracing yourself on the officer, that you're actually pushing the officer to the ground? . . .

A· · You could look at it that way.· I don't.· I mean, I don't think -- I don't think you can control what -- when you're trying to gain balance, I don't think you have a choice. I think your body is just -- you know, it's a natural reaction.· I mean, I don't -- I don't -- I don't know what -- if I was pushing him to the ground.
Q· · Isn't it true, sir, that you actually have the fabric of his shirt clenched in your hands?
A· · It's true that the fabric of his shirt is touching the palm of my hand, yes.
Q· · And your hand is curled around the fabric of his shirt; isn't that true, sir?
A· · I don't see that, no.· My hand won't open up all the way, so it's not -- I mean, I can't put it flat like this one.

Chris Vadnais Depo @ 243-6, 274-6, 278-9

As he watched the melee unfold, he wondered "what that is about?" He did not believe that Officer Sabino and Bohnstehn would knock into him and asserted there had been no time to move out of the way.  Chris Vadnais Depo @ 263-274.   Mr. Vadnais, after righting himself, stood there, on guard, to ward off any further contact.  Dana was at his side.  She did not see him grab Officer Sabino; nor did Dean.  She did not believe that Chris got angry as a result of being bumped.  Dana Vadnais Depo @ 140, 184; Sainz Depo @123, 128.  She told Chris they should leave.  Dana Vadnais Depo @ 143.  Officer Sabino and Bohnstehn then moved backwards onto the stage while the band members scrambled to protect their equipment. Jean Belanger Depo @ 105.

4

As a result of being summoned by Janet the bartender (Milam Depo @ 72), and an intoxicated woman he knew as Jenny (Jennifer Belanger, no relation to Jean the band member)[3], Officer Nunez came running into the bar through the back hallway to assist Officer Sabino. When asked at his deposition, he denied ever telling anyone he "ran" back

---

[3]   Officer Nunez did not recall being contacted by a third woman named Traci Pomeroy, who claimed to have contacted him as well. Noone else remembered Traci summoning help either.  Nunez Depo @ 40-42; Pomeroy Depo @ 84; Jennifer Belanger Depo @ 151-152; Milam Depo @ 121.

Traci and Jenny, who used to be friends, each claim Mr. Vadnais was yelling "police brutality" when watching the Sabino-Bohnstehn interaction.  Pomeroy Depo @ 79.  Ms. Pomeroy's vantage point, the volume of noise in the bar (she claims she can read lips from a brief exposure in third grade) and the fact that Chris was facing away from her all cast doubt on her claim.  Pomeroy Deposition at 141-146. Jennifer Belanger's claim is suspect as well.  Ms. Belanger was, according to Officer Nunez, drunk.  She was at the Padres game earlier that evening, but she denied drinking there.  The game ended at 10:08, and she and her husband took the Coaster home.  It departed an hour after the game, and takes about 1 hour to arrive at Oceanside, getting her to Tony's no earlier than midnight, just before these events. Jennifer Belanger Depo @ 22, 143-144, 150.   Declaration of Keith H. Rutman at page 3, ll 14-17, 23-25 and Exhibits 52 & 55.  Jennifer Belanger Depo @ 174-5. Officer Sabino does not recall ever hearing such a statement.  Janet denies flat out anyone uttered that statement.  Milam Depo @ 108, 183-4; Sabino Depo @ 58. Jean Belanger, a band member, was right there and only recalls one person yelling police brutality.  That person was filming on his cell phone.  Jean Belanger Depo @ 112.  As the video shows, that was not Chris.

Traci also asserts Mr. Vadnais was obnoxious all night (Pomeroy Depo @ 154-155), a claim belied by the video and testimony of both the bartender, who would know best, (Milam Depo @ 90-91, 183-184) and Jennifer Belanger.   Jennifer Belanger also claims that Traci told her that Chris Vadnais "propositioned" her (Traci), and that Traci believed Chris was friends with Tony.  Jennifer Belanger Depo @ 154-156.  Neither is true.

into the bar.  When shown to him, he tried to distance himself from the use of the term "running" by saying he meant was that he was moving quickly.  Nunez Depo @ 43-45.

He quickly crossed a distance of 20-25 feet and, scanning the scene, saw Officer Sabino wrestling with Bohnstehn.  Nunez Depo @ 46-7.  He "pushed" his way through the crowd, but does not remember saying anything to warn people.  Nunez Depo @ 51; Sainz Depo @ 132.  When asked at his deposition, he denied pushing anyone even though that is how he described it in his report.  Ultimately, he agreed with the term. Nunez Depo @ 50-51.

As a result of being jostled by bar employee James Smith (Nunez Depo @ 53), Officer Nunez forearm accidentally or inadvertently pushed Mrs. Vadnais on the back of her neck into her husband and the table. Nunez Depo @ 137-138; Dana Vadnais Depo @ 134.  Neither she nor Chris had seen him approaching.  Dana Vadnais Depo @ 189.   He also stepped on her foot.  Dana told Chris "I just got pushed." Dana Vadnais Depo @ 138, 191-2.  Despite her vantage point, Traci Pomeroy never saw this contact.  Pomeroy Depo @ 158.  There was lots of yelling as this was going on, and the jukebox was playing. Sainz Depo @ 59, 132; Jean Belanger Depo @ 116, 120.

Concerned that the officer had hurt his wife, Mr. Vadnais remembers reaching out to get Officer Nunez' attention and touching Officer Nunez on the elbow.  While the video makes clear that Officer Nunez was clearly dressed as a policeman, the events happened so quickly that Mr. Vadnais did not process this fact until after Officer Nunez turned to face him. He just recalled seeing a big guy in a dark shirt quickly moving past him.   Chris Vadnais Depo @ 253-4, 256-7.  Dana Vadnais saw Chris reach out, but nothing more. Dana Vadnais Depo @ 18-19;  Chris Vadnais Depo @ 290-292.  Officer Nunez stated in his report that he had been "grabbed" on his left shoulder[4] and spun around by the force of

---

[4]   When he had a chance to review the video, he realized the contact (however it can be described) was slightly above his right elbow.  Nunez Depo @ 26-7, 55-7

6

the grab.  Mr. Vadnais denies that he intended to, or did, grab[5] him.  As he turned to his right, he saw Plaintiff with an "angry[6] look" on his face, standing at a 45 degree angle, with his fists "low" and "clenched."  Assessing this as a "fighting stance", he believed Plaintiff was going to attack him.  Nunez Depo @ 64-5.  At the same time, Nunez heard someone say "stay out of it" and believed at the time it was Plaintiff.  On further reflection, he later concluded someone other than Plaintiff had uttered the statement.  Nunez Depo @ 58-59; Chris Vadnais Depo @ 247-250.

Jean Belanger remember seeing from his vantage point that Chris reached out and touched Officer Nunez, but he too declined to say it was a grab.  He remember Chris contemporaneously saying "Hey" or "Hey you hit my . . . "  Jean Belanger Depo @ 33, 41, 68, 71.  He described the atmosphere prior to the melee as mellow.  He described Chris as a "surfer dude."  Jean Belanger Depo @ 97-89.  He did not see Chris with his hands clenched.  Nor did he see Chris advancing toward Officer Nunez.  Jean Belanger Depo @ 170, 170, 183.  He testified it was possible Chris was upset at seeing his wife pushed, and described it as a 2 or 3 on a 1-10 scale.  By contrast, Chris was a 9 or 10 after having been punched.  Jean Belanger Depo @ 186-188.

Without warning, Officer Nunez, who stands at 6'2", 220 pounds, turned around and

---

[5]  It is true that Mr. Vadnais used the word "grab" that evening in an interview with Sgt. Bussey.  Under oath, he denied that what he did.  Dana Vadnais testified she did not believe that he grabbed Officer Nunez according to her viewing of the video.  Dana Vadnais Depo @ 18.  Similarly, Dean Sainz used the word "grab" that night, but believes it is incorrect because that implies "aggressiveness" which he asserted was lacking.  Sainz Depo @ 32, 37, 52-3, 55-6.  Janet watched the video and did not believe it depicted a "grab."

[6]  He denies being angry.  Q· · When you grabbed Officer Nuñez's arm, you were angry because you felt your wife had been bumped; isn't that true?  A· · Well, I felt like, "Hey," you know, "can you justify or give her an apology or something for" -- yeah.  Chris Vadnais Depo @ 254-5.  Dean also denies Chris was angry.  Sainz Depo @123.

in one continuous motion punched Plaintiff, who stands at 6'0", 165 pounds, in the eye (as he intended to do), and then pushed him to the floor with an outstretched arm, although he does not remember doing so.  It was not his intention to render Vadnais unconscious. Nunez Depo @ 23, 66-67, 70; Exhibit 5, page 8. The entirety of the events, from the tap/grab to the push, took 1.3 seconds.  Declaration of Joseph Cohen and expert report attached thereto.  Neither Dana nor Dean recalls any verbal interaction between Office Nunez and Chris during this action.  Dana Vadnais Depo @ 147; Sainz Depo @ 146..  Nor does Traci Pomeroy.  Pomeroy Depo @ 157.

Bar back James Smith, a trained combat veteran, described Officer Nunez' actions as "reactive," "simply defensive" and "fluid."  Smith Depo @ 57.  He testified that, in his opinion, and from his vantage point, there was no time for anyone to "express dominance" or "show aggression."  Smith Depo @ 59-60.  Mr. Smith believed that Chris' actions did not impede Officer Nunez' forward progress.  Smith Depo @ 92.

From this point in time forward, Mr. Vadnais has no independent memory of events until he was handcuffed on the floor, unable to breathe.   Chris Vadnais Depo @ 251. Officer Nunez then turned his attention back to assisting Officer Sabino[7].   Mr. Vadnais got up to his feet, enraged, and was restrained by Dean and Jennifer and Dana while attempting to charge Officer Nunez.  Dana Vadnais Depo @ 148.  Jean Belanger Depo @ 127. Officer Nunez turned, saw Mr. Vadnais approaching him, and in due course took him to the ground.  Officer Nunez pulled his baton and Taser, but did not use them.  Other officers entered the bar and Mr. Vadnais was handcuffed.

As a result of the second encounter with Officer Nunez, Mr. Vadnais was arrested and charged with felony assault on an officer in violation of Penal Code § 69.  He was

---

[7]    From this point forward, Plaintiff does not dispute, to the extent corroborated by the video,  the sequence of events described by Defendants in their motion with one exception.  Plaintiff contends he did not intentionally reach for Officer Nunez' baton if in fact that is what the video shows.  Chris Vadnais Depo @ 333, ll 20-22.

interviewed.  After the events had concluded, Officer Nunez was able to assess Mr. Vadnais' sobriety and concluded he was intoxicated.  Nunez Depo @ 86.  Although he was not driving, Mr. Vadnais' was asked to provide a PAS blood alcohol sample without any advisal of any right to refuse to do so.

Mr. Vadnais received a black eye as a result of the punch.  He also somehow suffered two fractured ribs as a result of the second encounter.  Chris Vadnais Depo @ 355-359.  Dana took him to Urgent Care upon his release from jail.  The doctor was concerned about an orbital socket fracture.  Dana Vadnais Depo @ 277.

Dana and Dean adamantly denied the claim of Traci Pomeroy that she, Jennifer and Dean discussed "getting their stories straight" while sitting on a bench outside right next to Pomeroy after the events.  Dana Vadnais Depo @ 67, 275; Sainz Depo @ 65; Jennifer Young Depo @ 215; Pomeroy Depo @ 1161-162.

Jennifer Belanger also claims to have heard Jennifer Young say that, but as she tells it, the statement was made inside the bar while Traci was not around.  Jennifer Belanger Depo @ 165-68.   Jennifer was interviewed that night and did not mention it.  She also failed to mention it at her Internal Affairs interview, but claims she called the Sgt. afterwards and told her.  No such report exists.  Jennifer Belanger Depo @ 190.

Both Pomeroy and Jennifer had seen the video and news stories and talked to each other before they spoke to Internal Affairs.   Jennifer Belanger Depo @ 168-170.  Although Traci stuck around that night to give a statement, noone "ever got to her."  She first gave her statement, and made this claim, when she was contacted by Internal Affairs.  Pomeroy claims she told the bartender and bar back (Janet and James) about this statement.  Janet denies ever hearing such a statement or that Traci and Jenny were even in the bar at the time she recalls talking to Jennifer Young.  Pomeroy Depo @ 164-7; Milam Depo @ 110, 187.  The woman Pomeroy identified on the video as having made this statement was likely Amber Nicole Hunt, the woman whom Officer Sabino first entered he bar to contact. Pomeroy Depo @ 170-171.  Further, Jennifer Belanger identified the "obnoxious" guy as someone other than Chris.  Jennifer Belanger Depo @ 171.

9

*III.     The Applicable Summary Judgment Standards*

Summary judgment is proper pursuant to F.R.C.P. 56(c) "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits show that there is no genuine issue as to any material fact, and that the moving party is entitled to a judgment as a matter of law." Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986).

To defeat a motion for summary judgment, the non-moving party must affirmatively show "the existence of specific facts showing that there is a genuine issue for trial." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 256 (1986). The standard is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." Id. at 251-52.

A factual dispute is "genuine" where "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." It is the substantive law's identification of which facts are critical and which are irrelevant that governs.  Facts unnecessary to the decision at trial are not "material." Id. at 242, 248.

When judging the evidence at the summary judgment stage, the evidence of the non-movant is to be believed.  The district court is not to make credibility determinations or weigh conflicting evidence, and is required to draw all justifiable inferences in a light most favorable to the nonmoving party.  Deppe v. United Airlines, 217 F.3d 1262, 1266 (9th Cir. 2000).

A court may disregard the party's sworn testimony if the testimony is internally inconsistent, but "if direct evidence produced by the moving party conflicts with direct evidence produced by the nonmoving party, the judge must assume the truth of the evidence set forth by the nonmoving party." Leslie v. Grupo ICA, 198 F.3d 1152, 1158 (9th Cir. 1999)

To succeed in a § 1983 claim, the burden is upon the plaintiff to establish by a preponderance of the evidence that the defendant: (1) performed an act or acts which operated to deprive him of one or more of his Federal Constitutional rights; (2) acted under

1   color of law; and (3) was the legal cause of the damages sustained by Plaintiff.  Wood v.

2   Strickland, 420 U.S. 308 (1985).  It is not necessary for a plaintiff to prove a defendant had

3   the specific intent to deprive him of his constitutional rights.  Monroe v. Pape, 365 U.S.

4   167, 187 (1961).

5        Factual matters concerning the reasonableness of a Fourth Amendment claim

6   generally are jury questions.  Wall v. County of Orange, 364 F.3d 1107, 1111 (9th Cir.

7   2004).

8   *IV.     The Appropriate Consideration of Video Evidence*

9        When videos capture the events in question, no genuine dispute of fact exists for

10   anything that is clearly discernable in a videotape of the events at issue, even if sworn

11   testimony in the record contradicts what the video shows. Scott v. Harris, 550 U.S. 372,

12   380-81 (2007). However, when the videos fail to capture "everything," the court may

13   consider supplemental evidence, including deposition testimony, so long as it is viewed in

14   the light most favorable to the non-moving party. Brosseau v. Haugen, 543 U.S. 194, 195

15   (2004).

16        In this case, while the videos show most of the relevant facts, they do not clearly

17   show them all.  First off, there is no audio.  Some interactions are hard to discern.  Some

18   events are completely blocked from view at certain angles.  The original videos (Exhibit 7)

19   have an improper aspect ratio that distorts the picture[8].  Defense counsel herself put it best

20   when she said during a deposition that:

21       . . . it's more important for you to tell us what's based on your memory --
    A· · ·Okay.
22       Q· · ·-- than your interpretation of the video.
    A· · ·Okay.
23   ·    Q· · ·Because ten people could look at the video and interpret it ten different ways.

24       Janet Milam Depo @ 79-80.

25       Roman Beck, a forensic videographer hired by Plaintiff, has concluded that the four

26

---

27       [8]   Defendants procured an enhanced set of the videos which adjust the aspect

28       ratio, but did not lodge them.

video files each had a similar capture rate of "approximately 30 frames per second." Defendants have not challenged this conclusion.  Declaration of Roman Beck.

Joseph Cohen, a human factors expert hired by Plaintiff, has analyzed Officer Nunez' actions by watching the tape frame by frame.  Using Mr. Beck's frame rate as his standard, he has concluded:

> "Nunez performed several split-second reactions in the time frame studied. Nunez initially reacted to Vadnais in .13 seconds by pulling away. He began turning clockwise, raising his right hand and clenching his right fist .17 seconds later. Within an additional .17 seconds, Nunez was moving toward Vadnais, and within another .20 seconds Nunez was punching Vadnais. After punching Vadnais, Nunez was starting a shove on Vadnais .43 seconds later.
>
> Vadnais also performed split-second reactions. Vadnais reacted to Nunez' by turning clockwise and maintaining eye contact in .33 seconds. It took Vadnais another .23 seconds to decide to lower his hands and posture. While maintaining eye contact with Nunez and lowering his hands and posture, Vadnais took .30 seconds to motion to his right as he was doing when Nunez aggressed. Vadnais made no discernible acts of aggression toward Nunez as Nunez grappled and shoved him to the ground."[9]

Gavin Huntley-Fenner, Ph.D., a cognitive psychologist hired by Defendants, did not dispute this time analysis[10] (Huntley-Fenner Depo @ 51, 54)

Officer Nunez contends that the still images extracted from the video footage (exhibits 19-42) justify summary judgment.   Dr. Huntley-Fenner seems to disagree:

A  Are you asking whether the brain is like a digital camera?

Q  Yeah. Is the brain like a video camera or a still camera where you're flipping the pictures together to create motion?

A  Well, your experience of the event is as a continuous event.

---

[9]   A breakdown of this sequence is attached as Exhibit F to the Expert Report of Joseph Cohen, which is attached to his authenticating declaration.

[10]   He did dispute Mr.  Cohen's conclusion that "Appreciable increases in reaction time were not observed for Officer Nunez that would be expected of a person weighing alternative methods, giving any consideration to the possible alternatives in the circumstances."  Defendants motion does not address this aspect of the case in great detail (see P&A @ 20).

1  Q Okay.

2  A But the brain is not a camera. So there's a – there is going to be some kind
   of sample rate, and it's going to be different than a camera, but your
3  experience of the event is continuous. So if you're asked about it or when you
   remember it or you might recollect it later, you recollect it as -- you may
4  recollect it as a continuous event.

5  Q Okay. But you also may recollect it as a series of moments in time. Is that
   fair to say?
6
   A I don't think so. Not at the frame-by-frame level. I think that's -- I don't
7  recall ever seeing anything like that.
                                          * * *
8  Q Okay. When a human being sees a hummingbird flying and sees the water
   splashing up, does it process it as a series of these particular frames, each one
9  slightly different than the next, or is it a continuous series of motion?

10  A We remember it and experience it as a continuing series. Continuous series
    of events.
11
    Q We experience it and remember it as a continuous series. Is that what you're
12  saying?

13  A Yes. What the brain is doing is a whole -- and what the visual system is
    doing and the sample rate – which how that information's acquired is a
14  different matter. But we -- our experience is in continuity.

15  Huntley-Fenner Deposition @ 37, 39.

16        In a recent study, a trio of academics concluded that watching a video of a harmful

17  or violent act being committed can provide useful evidence of the circumstances

18  surrounding the action. However, they also concluded that watching that same video in

19  slow motion can often cause viewers to see something that may not be there, what they

20  labeled "intentionality".  As one of the authors stated "This is because slow motion gives

21  the false impression that the actor had more time to think before acting."  See

22  https://newschicagobooth.uchicago.edu/newsroom/viewing-video-slow-motion-makes-acti

23  on-appear-more-intentional-new-study-finds and

24  http://www.pnas.org/content/113/33/9250.full (Both attached as Exhibit 54)

25        In the press release, the authors state:

26        . . . "Even when we made sure that participants knew how much clock time
          had actually passed, they still could not get over the feeling that things
27        unfolded more slowly and therefore tended to see more intentionality in the
          actions," according to Burns.
28

. . . In another experiment, the researchers used a sports video to test whether this slow motion intentionality bias applies not just to horrific criminal actions, but also to more mundane transgressions. They used a video of a prohibited helmet-to-helmet tackle from an NFL game.

"We found the same results as in the shooting video. Participants who saw slow motion thought the offending tackler was trying harder to strike the other player's helmet, that he had more of a plan to do so, and that he had more of an opportunity to avoid doing so," said Burns.

. . . Though slow motion may provide a better look at real-time events that happened quickly or in a chaotic environment, the researchers recognize that it can skew perception.

Thus, looking at still images is deceptive.

Plaintiff asserts, as did several witnesses, that the video of the incident shows Mr. Vadnais did not grab Officer Nunez' arm or sleeve, but lunged out and tapped his bare elbow. The action did not physically slow Officer Nunez down in the slightest aside from drawing his attention. Officer Nunez disagrees. A reasonable jury could conclude Officer Nunez began to draw back his right arm immediately upon turning around, without taking any time to assess the situation. A reasonable jury could also conclude by watching the video that Mr. Vadnais was not in a fighting stance, but rather had his right arm pointing backwards and his open left hand at his belt buckle, not drawn into a fist at his side. The jury will, of course, have to contend with the weight to give to Officer Nunez claim that he heard someone say "stay out of it[11]" as well as his concern for his partner's safety, neither of which is in dispute.

V.    *The Motion for Summary Judgment as to the Claim under 42 U.S.C. § 1983 for Excessive Force Must Be Denied Because Disputed Issue of Material Fact Remain.*[12]

In determining whether an individual seizure is reasonable, courts evaluate the "totality of [the] circumstances," <u>Missouri v. McNeely</u>, 133 S.Ct. 1552, 1559 (2013).

---

[11]   In retrospect, he concluded it was not Mr. Vadnais who made this statement.

[12]   The arrest based claim applies only to the second sequence of events, as Mr. Vadnais was not arrested for the touch/grab of Officer Nunez. The claim to qualified immunity shall be addressed separately.

14

It is a question of fact as to what force a reasonable officer would have used which controls, not his state of mind.  Evil intentions will not establish a constitutional violation if the force used was objectively reasonable, nor will good faith protect an officer who used unreasonable force.  Graham v. O'Connor, 490 U.S. 386 (1989)

The legal framework under the Fourth Amendment excessive force cases is well established:

> The first factor in determining whether the force used was excessive is the severity of the force applied. The second factor, and the most important, is the need for the force. The amount of force used is " 'permissible only when a strong government interest compels the employment of such force.'  Factors to be considered in determining the need for the force include " 'the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight.' " Finally, we must balance the force used against the need, to determine whether the force used was "greater than is reasonable under the circumstances." This determination "requires careful attention to the facts and circumstances of each particular case" and a "careful balancing" of an individual's liberty with the government's interest in the application of force.

Tekle v. U.S., 511 F.3d 839, 844-845 (9th Cir. 2006)(citations omitted).

"Because such balancing nearly always requires a jury to sift through disputed factual contentions, and to draw inferences therefrom" the Ninth Circuit has held on many occasions that summary judgment should be granted sparingly. This is because police misconduct cases almost always turn on a jury's credibility determinations."  Id.

"Where there is no need for force, any force used is constitutionally unreasonable." Headwaters Forest Defense v. County of Humboldt, 240 F.3d 1185, 1199 (9th Cir. 2000), vacated and remanded on other grounds sub nom. County of Humboldt v. Headwaters Forest Defense, 534 U.S. 801 (2001).

A simple statement by an officer that he fears for his safety or the safety of others is not enough to justify a search or seizure; there must be objective factors to justify such a concern. Deorle v. Rutherford, 272 F.3d 1272, 1281 (9th Cir. 2001).  Here, Officer Nunez states that he was concerned that his partner's safety.  This is not in dispute; Officer Sabino was indeed engaged in a struggle.  However, according to band member Jean Belanger's perspective,  Officer Sabino had the situation under control.

Because the force and arrest inquiries (and supporting facts) are distinct, establishing (or failing to establish) one does not automatically establish (or fail to establish) the other. Beier v. City of Lewiston, 354 F.3d 1058, 1064 (9th Cir. 2004).

> A.   *This Case Must Be Analyzed in 2 Discrete Segments.  First, the Push and the Punch, and Second, the Subsequent Fracas.*

The events surrounding the punch and the push are the gravamen of Plaintiff's complaint.  They will be discussed below.  The legality of the events surrounding the subsequent fracas was pursued pursuant to the "provocation doctrine."  The provocation doctrine states that "where an officer intentionally or recklessly provokes a violent confrontation, if the provocation is an independent Fourth Amendment violation, he may be liable for his [subsequent] defensive use of [deadly] force. Billington v. Smith, 292 F.3d. 1177, 1189 (9th Cir. 2002).

The continued validity of the provocation doctrine is in question, as the Supreme Court granted certiorari in the case of County of Los Angeles et. al. v. Mendez, et. al., No. 16-369.  In Mendez, the Ninth Circuit had reaffirmed the validity of the provocation doctrine (see 815 F.3d 1178, 1184–85 (9th Cir. 2016) rehearing denied 6/23/16, cert. granted 12/2/16), and the Supreme Court granted certiorari to resolve a circuit split.  The grant was limited to the following 2 questions:

> 1. Whether the Ninth Circuit's "provocation" rule should be barred as it conflicts with Graham v. Connor regarding the manner in which a claim of excessive force against a police officer should be determined in an action brought under 42 U.S.C.§ 1983 for a violation of a plaintiff's Fourth Amendment rights, and has been rejected by other Courts of Appeals?

> 3. Whether, in an action brought under 42 U.S.C. § 1983, an incident giving rise to a reasonable use of force is an intervening, superseding event which breaks the chain of causation from a prior, unlawful entry in violation of the Fourth Amendment?

The case was argued and submitted for decision on March 22, 2017.

Here, everyone has agreed that Mr. Vadnais was angry after being punched.  Several witnesses testified he was justifiably angry.  Plaintiff's expert Jack Smith opined Officer Nunez acted reasonably in his response to Mr. Vadnais' post push/punch behavior.  If the

"provocation" rule is rejected by the Supreme Court, any excessive force or illegal arrest claims arising from this aspect of the case can and should be eliminated by way of summary adjudication in Defendants favor.  If the "provocation" rule survives, however, then this aspect of the case wold rise or fall depending upon the Court's resolution of the reasonableness of the punch/push.

> **B.**    *Summary Judgment Is Not Warranted When it Comes to the Push and the Punch Because Too Many Facts Are in Dispute.*

Ninth Circuit Pattern Jury Instruction No. 9.25 provides in part that:

> Under the Fourth Amendment, a police officer may use only such force as is "objectively reasonable" under all of the circumstances. You must judge the reasonableness of a particular use of force from the perspective of a reasonable officer on the scene and not with the 20/20 vision of hindsight. Although the facts known to the officer are relevant to your inquiry, an officer's subjective intent or motive is not relevant to your inquiry.

The use notes to the instruction provide "[t]he calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments-in circumstances that are tense, uncertain, and rapidly evolving-about the amount of force that is necessary in a particular situation." <u>Graham v. Connor</u>, 490 U.S. 386, 396-397 (1989)(emphasis added).

The instruction provides 13 non-exclusive factors to be considered.  Applying these factors in turn:

> *1.    the nature of the crime or other circumstances known to the officer[s] at the time force was applied*;

Defendants assert Plaintiff was intoxicated and angry.  He admits the former and denies the latter.  However, "lack of due care on the part of a plaintiff is not a defense to allegations of a violation of federal civil rights. <u>Tate v. Canonica,</u> 180 Cal. App. 2d. 898 (1960).

Defense expert Dr.  Iain McIntyre, a forensic toxicologist, has opined "As a consequence of having a BAC of 0.152%, Mr. Vadnais would <u>most likely</u> display emotional instability, loss of critical judgment, and impaired perception, memory, and

comprehension. Furthermore, he may have decreased sensory response, an increased reaction time, sensory-motor incoordination, impaired balance, slurred speech, decreased inhibitions, and diminished attention. These clinical signs/symptoms are frequently associated with a BAC at or about the concentration determined in Mr. Vadnais, based upon the Dubowski States of Acute Alcohol Influence/Intoxication[13]." McIntyre Declaration at ¶ 9. Plaintiff does not dispute this opinion.

Because Officer Nunez did not know his level of intoxication at the time the force was used or even that he was intoxicated at all,  he cannot justify his actions on this basis. See United States v. Collins, 427 F.3d 688, 691 (9th Cir. 2005)("Facts uncovered after the arrest are irrelevant.") He can certainly say Plaintiff looked angry and combative, but cannot attribute it to alcohol consumption.  Thus, the fact of his intoxication can only be considered for its relevance to Plaintiff's perception of events and his ability to recall them.  It also would support Plaintiff's assertion that his contact with Officer Sabino was inadvertent due to his loss of balance.

Finally, the exact blood alcohol concentration (BAC) of 0.152% as tested on a Preliminary Alcohol Screening Device (PAS) is inadmissible.  (Defendants' NOL 1-2)

California Vehicle Code §23612 provides in relevant part:

(h)     A preliminary alcohol screening test that indicates the presence or concentration of alcohol based on a breath sample in order to establish reasonable cause to believe the person was driving a vehicle in violation of Section 23140, 23152, or 23153 is a field sobriety test and may be used by an officer as a further investigative tool.

(I)     If the officer decides to use a preliminary alcohol screening test, the officer shall advise the person that he or she is requesting that person to take a preliminary alcohol screening test to assist the officer in determining if that person is under the influence of alcohol or drugs, or a combination of alcohol and drugs.

---

[13]     Attached as Exhibit 53 to the Declaration of Keith H. Rutman.  This particular Stage of Alcoholic Influence is considered "Excitement" and can range from 0.09-0.25% BAC.  Dr. McIntyre does not explain how the numerous conditions apply, or are more pronounced, throughout the range of BAC concentrations.

The person's obligation to submit to a blood, breath, or urine test, as required by this section, for the purpose of determining the alcohol or drug content of that person's blood, is not satisfied by the person submitting to a preliminary alcohol screening test. The officer shall advise the person of that fact and of the person's right to refuse to take the preliminary alcohol screening test[14]. (emphasis added)

The preliminary alcohol screening test is not determinative of blood alcohol content, but is a field sobriety test. Kodani v. Snyder 75 Cal.App.4th 471, fn 2 (1999).

"In the absence of any evidence to the contrary, we must accept the Legislature's implicit finding that the tests are not equivalent, and therefore that despite the taking of the PAS test, it remains important to obtain the more reliable results of the chemical test before the evidence becomes unavailable with the passage of time" People v. Wilson, 114 Cal. App.4th 953 (2003)(allowing admission of subsequent blood test results but excluding PAS results at trial.)

What that leaves the Court with is the fact that as Officer Nunez ran in to help his partner, he inadvertently pushed Dana. In response, depending upon who is to be believed, Chris touched or grabbed him on the right arm. Further depending upon who is to be believed, Chris was either in a fighting stance or turning to point in his wife's direction and was or was not a threat. He was then punched and pushed.

2. *whether the plaintiff posed an immediate threat to the safety of the officer or to others;*

Officer Nunez made his threat assessment  in .20 seconds based upon (1) his reaction to a "grab" (disputed); (2) a statement "stay out of it," made in a highly charged crowded environment, that he mistakenly attributed to Plaintiff at the time; (3) an asserted "fighting stance" (disputed). The video reasonably shows otherwise. Depending upon who is to be believed, Mr. Vadnais was not advancing on Officer Nunez, and was turning away from him with his hands down at his sides while starting to point backwards.

---

[14]  Exhibit 4, the transcript of Plaintiff's interview with Sgt.  Bussey the night of the incident, makes clear Plaintiff was not advised of his right to refuse such a test.

Nor did Mr Vadnais issue any physical challenge.

> *3.     whether the plaintiff was actively resisting arrest or attempting to evade arrest by flight;*

N/A.

> *4.     the amount of time the officer had to determine the type and amount of force that reasonably appeared necessary, and any changing circumstances during that period;*

Officer Nunez made his threat assessment in .20 seconds.  He completed his reaction another 1.1 seconds later.  The only changing circumstances were that, as the video reasonably shows, Plaintiff's continued motion made clear he was not a threat.

> *5.     the type and amount of force used;*

OPD policy allows for the use of a distraction blow if it is reasonable to do so.  See Oceanside Police Department Use of Force Policy and Procedures (Def.  Ex. 46) §§ 120.04, 501.01, 501.04(a), and 501.06(d)[15].  However, punching someone in the eye can lead to damage to the orbital socket.  Dana Vadnais Depo @ 277.

> *6.     the availability of alternative methods [to take the plaintiff into custody] [to subdue the plaintiff];*

This is key.  Verbalization was not even considered.  As defendants note, "With respect to the possibility of less intrusive force, officers are not required to use the least intrusive means available so long as they act within a range of reasonable conduct. Scott v. Henrich, 39 F.3d 912, 915 (9th Cir. 1994).  As argued herein, the decision to strike Plaintiff was unreasonable.

> *7.     the number of lives at risk (motorists, pedestrians, police officers) and the parties' relative culpability; i.e., which party created the dangerous situation, and which party is more innocent;*

---

[15]   Officer Nunez practices "weaponless striking" of suspects only during Department refresher courses.  Nunez Depo @ 113.

20

The only person who intentionally created a dangerous situation was Nestor Bohnstehn.  Officer Sabino probably exacerbated it by not awaiting cover to apprehend Bohnstehn.  James Smith, the bartender, exacerbated it when he accidentally bumped into the incoming Officer Nunez, causing him to exacerbate it by bumping against Mrs. Vadnais, which in turn led Mr. Vadnais to exacerbate it by instinctively reacting to the large person rushing past him to get his attention.  A cascade of events for sure, but not really intentional conduct by anybody.

> 8.     *whether it was practical for the officer[s] to give warning of the*
>        *imminent use of force, and whether such warning was given;*

As Jack Smith opined, it was practical. Clearly, no warning was given (unlike during the second encounter).

> 9.     *whether the officers were responding to a domestic violence*
>        *disturbance;*

N/A.

> 10.    *whether it should have been apparent to the officer[s] that the person*
>        *he used force against, was emotionally disturbed;*

N/A.

> 11.    whether a reasonable officer would have or should have accurately
>        perceived a mistaken fact;

Plaintiff asserts that a reasonable officer would should have accurately perceived a mistaken fact, to wit, his lack of assaultive intent or intent to actually interfere.

> 12.    *whether there was probable cause for a reasonable officer to believe*
>        *that the suspect had committed a crime involving the infliction or threatened*
>        *infliction of serious physical harm;*

Officer Nunez opined the "grabbing" of the arm was at worst a felony violation of Penal Code § 69 or at best a misdemeanor violation of Penal Code § 148.  Plaintiff asserts there is a lack of probable cause for either as far as the punch/push aspect of the case is concerned.  No serious physical harm was inflicted, and it is disputed whether it was

threatened.

*13.    other factors particular to the case.*

Plaintiff can identify no other factors that ought to be considered.

Plaintiff's use of force expert, Jack Smith, has opined:

1.     The nature of the crime or other circumstances known to the officer[s] at the time force was applied would indicate that Officer Nunez had entered the bar and was moving toward his partner who was allegedly on the ground while involved in an altercation as reported by witnesses to Officer Nunez. Accordingly, Officer Nunez entered the bar fearing that his partner was in danger of being seriously injured, and his attention was directed towards moving through the crowd in a manner as quickly as possible. His attention was obviously thwarted when Mr. Vadnais placed his hand on Nunez' arm while responding to aid his partner. It appears obvious in the video tape that Officer Nunez rapidly turned around and, in one continuous motion, struck Mr. Vadnais in the face without taking time to properly consider the tactics that should have been used to disengage with Mr. Vadnais. Clearly, verbalization rather than physical force should have been attempted first.

2.     It is my conclusion that Mr. Vadnais did not pose an immediate threat to the officer by attempting to gain his attention by placing his hand on the officer's arm.

3.     It is also obvious that Mr. Vadnais was not actively resisting arrest or attempting to evade Officer Nunez at the time he was punched by the officer. Rather, the totality of the incident caused Officer Nunez to overreact and use excessive force to terminate any encounter with Mr. Vadnais which was not justified by Mr. Vadnais' actions.

4.     A review of the video tape causes me to conclude that the force used by Officer Nunez was not objectively reasonable and was simply a misinterpretation of Mr. Vadnais' intentions. Clearly, there was time for the officer to reflect on the situation he was confronted with and act appropriately and without the use of excessive force. The type and amount of force used was not circumspect and alternative tactics such as verbalization and warnings were appropriate and should have first been used by Officer Nunez rather than first using physical force in the form of a punch to Mr. Vadnais face.

5.     I have also considered the issue of qualified immunity for Officer Nunez based upon the totality of the circumstances. However, it is my conclusion that a reasonable officer using proper tactics would have taken the time to accurately perceive the intentions of Mr. Vadnais rather than immediately resort to a dangerous use of physical and excessive force without warning.

6.     Lastly, I have concluded that based upon the totality of the circumstances which included Officer Nunez pushing his way through a crowded bar and making physical contact with Mrs. Vadnais, that the officer did not have probable cause to believe that Mr. Vadnais was committing a crime simply by the fact that he had touched Officer Nunez in a manner indicating only that he wished to talk with him rather than engage in an altercation.

22

1    Mr. Smith is well qualified and has expressed an opinion contrary to the defense

2    experts.  Such competing assertions of opinion cannot be resolved on summary judgment.

3    **VI.**   *The Motion for Summary Judgment as to the Claim for Battery under California*
     *Law Must Be Denied Because the Corresponding Civil Rights Claim is not Subject*
4    *to Summary Judgment.*

5    To establish a battery claim against an officer in California, the standards are the

6    same as those under § 1983. Edson v. City of Anaheim, 63 Cal.App.4th 1269, 1272-73

7    (1998).  Plaintiff's state law claim is based upon the same facts as the § 1983 claims.

8    Plaintiff agrees with Defendant that they should be resolved identically.   For the same

9    reasons that summary judgment is inappropriate in the excessive force claim, it should be

10   denied as to the state law claims as well.

11   **VII.**  *Whether Officer Nunez Is Entitled to Qualified Immunity Cannot Be Resolved at the*
     *Summary Judgment Stage Because of the Existence of Genuine Disputes of Material*
12   *Fact.*

13   Defendants bear the burden of proving they are entitled to qualified immunity.

14   Moreno v. Baca, 431 F.3d 633, 638 (9th Cir. 2005).

15   Qualified immunity protects government officials "from liability for civil damages

16   insofar as their conduct does not violate clearly established statutory or constitutional

17   rights of which a reasonable person would have known." Pearson v. Callahan, 555 U.S.

18   223, 231 (2009).  It shields a public official from suit if, under the plaintiff's version of the

19   facts, a reasonable official in the defendant's position could have believed that his conduct

20   was lawful in the light of clearly established law and the information the official possessed

21   at the time the conduct occurred. Hunter v. Bryant, 502 U.S. 224, 227 (1991); Schwenk v.

22   Hartford, 204 F.3d 1187, 1195–96 (9th Cir. 2000). It "gives ample room for mistaken

23   judgments" and protects "all but the plainly incompetent or those who knowingly violate

24   the law." Malley v. Briggs, 475 U.S. 335, 341 (1986).

25   The Supreme Court has endorsed a two-part test for resolving such claims: a court

26   must decide (1) whether the facts that a plaintiff has alleged "make out a violation of a

27   constitutional right," and (2) whether the "right at issue was 'clearly established' at the

28   time of the defendant's alleged misconduct." Saucier v. Katz, 533 U.S. 194, 201 (2001)).

23

1    Courts may address these two prongs in either order. <u>Pearson</u>, at 236.

2          Even in qualified immunity cases, the court must assume the nonmoving party's

3    version of facts to be correct.  <u>Liston v. County of Riverside</u>, 120 F.3d 965, 976 fn. 10-977

4    (9th Cir.1997)("We have held repeatedly that the reasonableness of force used is ordinarily

5    a question of fact for the jury."); <u>Santos v. Gates</u>, 287 F.3d 846, 853 (9th Cir.2002)("we

6    have held on many occasions that summary judgment or judgment as a matter of law in

7    excessive force cases should be granted sparingly."); <u>Hughes v. Kisela</u> 841 F.3d 1081,

8    1087 (9th Cir. 2016)(same); <u>Tekle v. U.S.</u> 457 F.3d 1088, 1094 (9th Cir. 2006)(police

9    misconduct cases almost always turn on a jury's credibility determinations and/or because

10   the reasonableness of force used is ordinarily a question of fact for the jury.)

11         "A clearly established right is one that is sufficiently clear that every reasonable

12   official would have understood that what he is doing violates that right." <u>Mullenix v. Luna</u>,

13   136 S. Ct. 305, 308 (2015) .

14         In determining whether or not the right at issue was clear at the time of the incident,

15   a court need not conclude that the very action at issue must have been specifically

16   held unlawful before qualified immunity is shed.  <u>Hope v. Pelzer</u>, 536 U.S. 730,

17   739 (2002).  A police officer is not entitled to qualified immunity simply because there is

18   no prior case prohibiting the use of this specific type of force in precisely the

19   circumstances involved.  Rather, the test is whether the defendant, acting  as a "reasonable

20   officer" had "fair warning" that their conduct was unlawful in the situation they

21   confronted.  <u>Id</u>. at 741.

22         In <u>White v. Pauly</u>, 137 S. Ct. 548 (2017) the Court, recently summarized the law as

23   follows:

24         . . . While this Court's case law " 'do[es] not require a case directly on point' "
             for a right to be clearly established, " ' existing precedent must have placed the
25           statutory or constitutional question beyond debate.' " (citation) In other
             words, immunity protects " 'all but the plainly incompetent or those who
26           knowingly violate the law.' " (citation)

27         Today, it is again necessary to reiterate the longstanding principle that
             "clearly established law" should not be defined "at a high level of generality."
28           <u>Ashcroft v. al–Kidd</u>, 563 U.S. 731, 742 (2011). As this Court explained

decades ago, the clearly established law must be "particularized" to the facts of the case. <u>Anderson v. Creighton</u>, 483 U.S. 635, 640, (1987). Otherwise, "[p]laintiffs would be able to convert the rule of qualified immunity ... into a rule of virtually unqualified liability simply by alleging violation of extremely abstract rights." Id., at 639.

. . . Of course, "general statements of the law are not inherently incapable of giving fair and clear warning" to officers, <u>United States v. Lanier</u>, 520 U.S. 259, 271, (1997), but "in the light of pre-existing law the unlawfulness must be apparent," <u>Anderson v. Creighton</u>, supra, at 640. For that reason, we have held that <u>Garner</u> and <u>Graham</u> do not by themselves create clearly established law outside "an obvious case." <u>Brosseau v. Haugen</u>, 543 U.S. 194, 199 (2004) (per curiam).

Id. at 551-552; see also <u>Hughes v. Kisela</u> (9th Cir. 2016) 841 F.3d 1081, 1088

In this case, both OPD policy and "clearly established" law make clear to Officer Nunez that a distraction blow is only lawful if it was reasonable.  As he must, he therefore contends that only his behavior was reasonable, not that how he was uncertain or unclear as to what was permitted.  As such, qualified immunity can only be granted if the facts that Plaintiff has alleged "make out a violation of a constitutional right."  This is in dispute and requires a jury to make its factual findings.   Officer Nunez' subjective opinion, and that of his employer or hired expert, is not sufficient to justify summary judgment.  To paraphrase, "otherwise, [officers] would be able to convert the rule of qualified immunity ... into a rule of virtually unqualified liability simply by alleging [they believed their conduct to be justified and reasonable.]

*VIII.   Conclusion*

For the foregoing reasons, Plaintiff requests that the Motion for Summary Judgment or Adjudication be denied and the Court allow the case to proceed to jury trial.

Respectfully Submitted,

Dated: April 3, 2017

s/ Keith H. Rutman
KEITH H. RUTMAN
Attorney for Plaintiff
Email: krutman@krutmanlaw.com

25